A-301-805<br>
Remand:  Slip Op. 25-129<br>
Investigation<br>
POI:  4/1/2022-3/31/2023<br>
<strong>Public Document</strong><br>
E&C/OIII:  BCQ

***Coalition for Fair Trade in Shopping Bags v. United States***
**Court No. 24-00157, Slip Op. 25-129**
**(CIT October 1, 2025)**
**Certain Paper Shopping Bags from Colombia**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) issued in *Coalition for Fair Trade in Shopping Bags v. United States*, Court No. 24-00157, Slip Op. 25-129.[1]  This action arises out of Commerce's final affirmative determination in the investigation of sales at less than fair value (LTFV) on certain paper shopping bags from Colombia covering the period of investigation (POI) April 1, 2022, through March 31, 2023.[2]

In remanding *Final Determination*, the Court found that Commerce improperly applied the knowledge test to determine whether a sale made by Ditar, S.A. (Ditar), the sole respondent individually-reviewed in the underlying investigation should be treated as a home market or U.S. sale.  The Court faulted Commerce's reliance on evidence concerning Ditar's constructive

---

[1] *See Coalition for Fair Trade in Shopping Bags v. United States,* Court No. 24-00157 (CIT October 1, 2025) (*Remand Order*) and Slip Op. 25-129 (CIT October 1, 2025) (*Remand Opinion*) (collectively, *Remand Opinion and Order*).
[2] *See Certain Paper Shopping Bags from Colombia:  Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 45843 (May 24, 2024) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

knowledge of the sale in question's destination, without properly considering evidence regarding whether Ditar had actual knowledge of the sale's destination or "should have known" that the sale was destined for the United States.[3] Thus, the Court remanded for Commerce to address the actual knowledge prong of the knowledge test based on Ditar's statements at verification.[4]

In light of the *Remand Opinion and Order*, Commerce has reexamined the information on the record regarding the classification of the sale in question, including the company's own statements concerning its knowledge that the merchandise was destined for the United States, and has determined that the sale in question should be classified as a U.S. sale based on Ditar's knowledge of the sale's destination at the time of the sale. Therefore, we have reclassified the relevant transactions as U.S. sales and recalculated Ditar's margin accordingly, as well as the all-others rate derived from Ditar's margin.[5]

## II.    BACKGROUND

During the underlying LTFV investigation, Commerce conducted a sales verification of Ditar.[6] At the outset of verification, Commerce permitted Ditar the opportunity to identify any "minor corrections" to the sales reporting which the company discovered in preparation for verification and to present these corrections to Commerce.

In one such "minor correction," Ditar identified certain details related to a sale of subject merchandise reported in its home market sales database which suggested that the sale was resold by the unaffiliated domestic customer for export to the United States.[7] Ditar explained that the

---

[3] *See Remand Opinion* at 9-12
[4] *Id.* at 12-13.
[5] *See* Memorandum "Analysis of the Draft Results of LTFV Redetermination Margin Calculations for Ditar, S.A.," dated February 17, 2026 (Draft Results Analysis Memo).
[6] *See* Memorandum, "Verification of the Sales Questionnaire Responses of Ditar, S.A.," dated March 11, 2024 (Ditar's Sales Verification Report), at 2-4 and SVE-1; *see also* Ditar's Letter, "Minor Corrections Presented at Verification," dated February 7, 2024.
[7] *See* Ditar's Sales Verification Report at 4-5.

sale was reported as a home market sale in the records used to compile the home market database because it was made to a Colombian customer and incurred value-added taxes (VAT) not required for export sales, so the sale was recorded as a domestic sale in Ditar's accounting system and otherwise appears as a typical domestic sale.[8]

However, upon further review of the sales documents in preparation for verification, company personnel noted a charge associated with the cost of a new printing plate billed to the customer on the invoice, and explained this type of expense is only separated as a distinct line item on export sales invoices in its normal course of business.[9] Company officials explained that the unusual nature of the inclusion of this charge on a domestic sale invoice prompted them to follow up with the members of the sales team involved in the transaction, as well as the Colombian purchaser, who confirmed that the merchandise was resold to a downstream customer in the United States.[10] The personnel involved in the sale confirmed that it was made to a domestic customer with whom Ditar typically conducted 'normal' home market sales (which are typically in lower quantities of unprinted bags or printed with existing design plates), but this sale was unique in that it was higher volume and requested a new printing plate design, as the customer intended to export the bags to the United States.[11] Ditar officials noted that they were unaware of the details of the intended resale and did not know if the customer actually resold the

---

[8] *Id.*
[9] *See* Ditar's Sales Verification Report at 4-5 and Verification Exhibits SVE-1 and SVE- 17. Ditar explained that it charges customers for the design and creation of new printing plates that are used to imprint the design's ink on a paper bag whenever a sales order specifies a new name, logo, *etc.* not covered by an existing plate. These charges are assessed only once on an initial sales invoice, and then those same plates are reused for several years on all subsequent orders with the same design specifications. Ditar explained that it charges both its domestic and export customers for the cost of new plates, but because its domestic customers typically require less complex design plates and order more non-printed bags than its export customers who more frequently request new design plates, Ditar's practice is to build the cost of new or replacement print plates into the sales price for domestic sales, but charge its export customers a separate plate charge on the face of the invoice.
[10] *Id.*
[11] *Id.*

merchandise to the United States until they solicited further information from the customer upon discovery that the unaffiliated customer had complete control over the timing and terms of subsequent shipments to the United States.[12]

Further, aside from the charge for the print plate, Ditar found that the sale otherwise required no special markings or certifications and otherwise transacted and was booked as a standard home market sale.[13] However, Ditar acknowledged that the inclusion of the plate charge on the face of the invoice as a standalone expense (rather than included in the price) and the details conveyed by the sales team regarding the transaction (including the sales negotiation and design process, as well as what they could deduce from the design itself), indicated that company personnel had knowledge that the merchandise was to be resold to the United States at the time of sale to the domestic customer.[14] This "minor correction" was presented to Commerce at verification without identifying any specific correction, but instead laid out the above facts for further consideration because Ditar and its counsel acknowledged that they were not entirely sure whether the sale should be properly reported as a home market sale or a U.S. sale. Ditar noted that if Commerce determined the sale should instead be classified as a U.S. sale in consideration of its knowledge test, Ditar would update the database accordingly.[15]

Commerce then provided additional scrutiny to confirm that the circumstances of the sale were unique and not indicative of a larger universe of potential misclassification. Specifically, we reviewed all other sales to the customer in question, which reflected no indication that the sale was likely to be resold in the United States (*i.e.*, the sales quantities were consistent with those typical for other domestic transactions, the invoices did not include plate charges, the sales

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

related documentation and correspondence otherwise reviewed lacked any detail which would suggest that the sale was intended for export, and each was made by a sales official responsible for only domestic sales).[16]  Further, none of the considerable quantity of home market invoices reviewed at verification included the line item for the plate charge which identified the transaction in question as likely to have been exported.  Accordingly, we accepted the minor correction as reported.[17]

In the case briefing stage of the investigation, the Coalition For Fair Trade in Shopping Bags (the petitioner) identified this "misclassification" of a U.S. sale as a home market sale as one component which supports its primary argument that the numerous discrepancies discovered at verification, including Ditar's erroneous reporting of certain U.S. sales as home market sales, taken together demonstrate that Ditar failed to cooperate by not acting to the best of its ability to report accurate sales data, and that the final margin should be based on the Petition rate as total adverse facts available (AFA) pursuant to section 776(b) of the Tariff Act of 1930, as amended (the Act).[18]  Separately, the petitioner argued that, should Commerce not agree that the weight of all discrepancies identified warrant application of total AFA, but agree that application of partial AFA remains appropriate with respect to certain portions of the margin calculation and is necessary to correct for deficiencies and errors found at the sales verification, and that the transaction in question was misclassified, Commerce should remove from the margin calculation the two reported home market transactions which Ditar indicated it had knowledge were ultimately destined for the United States as partial AFA.[19]

---

[16] *Id.* at 15.
[17] *Id.*, at 4-5.
[18] *See* Petitioner's Letter, "Petitioner's Case Brief on Sales Issues," dated April 1, 2024 (Petitioner's Sales Case Brief), at 2-10.
[19] *Id.* at 10-12.

In the *Final Determination*, Commerce concluded that the sale in question was properly reported as a home market sale because "the record does not support a finding that Ditar had knowledge that the merchandise was intended to be exported and resold in the United States at the time of sale to the customer."[20] Specifically, Commerce cited the lack of evidence that Ditar prepared or signed any documentation relevant to the shipping, handling, and packing of subject merchandise which stated that the merchandise was destined for export to the United States and noted that the VAT tax information supported that Ditar believed at the time of sale that the ultimate destination of the products sold in would be Colombia. Accordingly, we did not find that classification of this sale as a home market sale supported the petitioner's argument for total AFA based on the totality of evidence of discrepancies identified at verification, nor warranted application of partial AFA standing alone in the alternative.[21]

In litigation, the petitioner challenged Commerce's finding that Ditar correctly reported the two line-items in the transaction as a home market sale arguing that the *Final Determination* impermissibly ignored statements in the verification report regarding Ditar's admissions which established the company's actual knowledge that the disputed sale was bound for export.[22]

In the *Remand Opinion and Order*, the Court identifies two problems with Commerce's analysis. First, the Court maintains that Commerce's final determination did not address multiple statements in the verification report that the company "had knowledge" of the merchandise's destination.[23] The Court further disagrees with Commerce's statements that "Commerce gives greater consideration to physical evidence and documentation prepared at the time of a transaction than to unsubstantiated statements or declarations made by company

---

[20] *See Final Determination* IDM at Comment 1.
[21] *Id.* at Comments 1 and 2.
[22] *See* Petitioner's Sales Case Brief at 5-6.
[23] *See Remand Opinion* at 9-10.

officials."[24]  The Court asserts that Commerce's argument "wrongly conflates the two prongs of the knowledge test, and that a respondent's admission that it knew of the U.S. destination is enough, by itself, to establish actual knowledge if it shows what the company knew at the time of the sale."[25]  The Court maintains that a respondent's admission that it knew of the U.S. destination is enough, by itself, to establish actual knowledge if it shows what the company knew at the time of the sale.[26]  Moreover, the Court asserts further that evidence of constructive knowledge, such as the "physical evidence and documentation," becomes relevant only "{i}n the absence of . . . an admission, or actual knowledge."[27]  The Court points out that Commerce did not properly consider whether Ditar's statement constituted an admission of knowledge, or whether Ditar had "knowledge" at the time of sale or at some later date.[28]  According to the Court, Commerce jumped directly to constructive-knowledge evidence without first deciding whether Ditar made an admission and, if so, what weight to accord it.[29]

The Court holds that the *Final Determination* did not sufficiently consider whether Ditar "should have known" the sale was destined for the United States, stating only that "the record does not support a finding that Ditar *had knowledge* {*i.e.*, 'knew'} that the merchandise was intended" for export to the United States.[30]  According to the Court, documentary evidence of

---

[24] *Id.* at 10 (citing *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Results of Antidumping Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2019-2020*, 86 FR 49509 (September 3, 2021), and accompanying IDM at Comment 2).
[25] *Id.* at 10 (citing *JA Solar International Ltd. v. United States*, 606 F.Supp.3d 1370, 1379 (CIT 2022); and *Final Results of Antidumping Duty Administrative Review: Certain In-Shell Raw Pistachios from Iran*, 70 FR 7470 (February 14, 2005) (*Pistachios from Iran*), and accompanying IDM at 11 (acknowledging that documentation, contracts, packaging, and the like are relevant "to determine whether the producer had constructive knowledge" and distinguishing that from actual knowledge based on an admission)).
[26] *Id.*
[27] *Id.*
[28] *Id.* at 10-11.
[29] *Id.* at 11 (citing *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 FR 76966 (December 23, 2014), and accompanying IDM at 35 (establishing that Commerce has observed that an admission may carry particular weight when it cuts against the admitting party's own interest)).
[30] *Id.* at 11.

that sort is not probative of *actual* knowledge, since *Allegheny Ludlum*, 215 F. Supp. 2d at 1332 holds that "{t}he only way to determine actual knowledge is through an admission of the respondent."[31]  Thus, the Court found that Commerce's discussion of whether evidence *other than* "an admission" showed what "Ditar knew at the time of sale" was thus contrary to law.[32]  In addition, the Court found Commerce's analysis to be incomplete because it did not discuss whether the company *should have known* of the bags' ultimate destination - a question for which the non-admission evidence would have been relevant.[33]

The Court thus remands the issue to Commerce to address the "actual" prong of the knowledge test on its own merits without importing evidence relevant only to the "constructive" prong of the knowledge test.  The Court specified further that if Commerce finds that Ditar's statements, alone, are not admissions that establish actual knowledge at the time of sale ("knew"), it must, then, examine whether the company had constructive knowledge based on the other evidence in the record ("should have known").[34]  Finally, if Commerce recalculates Ditar's margin, the Court specified that it must adjust the All-Other's rate derived from it.[35]

## III.   ANALYSIS

At verification, the company explicitly stated that it had knowledge that two reported sales in the transaction at issue was destined for the United States.[36]  It explained that, in the preparation for verification (specifically compiling sales documentation for support of this sale "pre-selected" by Commerce in Verification Exhibit VE-17), reviewers noted that the sales invoice included a charge which Ditar typically will only separate out as a distinct line item

---

[31] *Id.* at 12.
[32] *Id.*
[33] *Id*.
[34] *Id.* at 12-13.
[35] *Id.*
[36] *See* Ditar's Sales Verification Report at 15.

8

where the sale is for export. The inclusion of this charge on the face of the invoice at the time of sale thus indicates sales personnel knew that this domestic sale had some export component to it at the time of sale, and this knowledge was confirmed by Ditar's explicit statements at verification.[37]

In evaluating this issue in the *Final Determination*, Commerce concluded that Ditar did not have knowledge of the destination of the sale, but in its evaluation, Commerce did not focus on statements on the record regarding Ditar's knowledge and instead relied on what the Court characterizes as evidence of constructed knowledge in finding the sale to be classified as a home-market sale.[38] Specifically, Commerce relied on evidence showing that the sale incurred VAT charges and otherwise resembled a normal domestic sale, including the identity of the customer (with whom Ditar had a pre-existing relationship and to whom it otherwise sold merchandise exclusively for domestic consumption), the sales terms, and freight arrangements.[39] Commerce also relied on Ditar's verified explanations that it lacked constructive knowledge of when or whether the downstream unaffiliated customer actually exported the merchandise to the United States, as well as the absence of any documentation or declaration that the downstream sale was export related.[40] However, upon further analysis, Commerce agrees with the Court that the *Final Determination* did not sufficiently contend with the information on the record relevant to the primary question of whether the sale was properly classified as a home market sale or should have been reported as a U.S. sale as a result of Ditar's admission regarding its own knowledge at the time of sale of the customer's intent to sell the merchandise downstream in the United States.

---

[37] *Id.* at 4-5 and 15-16.
[38] *See Final Determination* IDM at Comment 1.
[39] *Id.*
[40] *Id.*

As observed in the verification report, Ditar's sales team (or, at least, certain members of this team) had knowledge of the customer's intent to export the merchandise to the United States.[41] Statements on the record suggest that knowledge was likely conveyed to Ditar's sales team in pre-sale discussions with the customer during the sales negotiation and design process, and knowledge that the sale was likely to be resold in the United States could be reasonably inferred from the English-language on the design requested and the large export-scale quantity of the transaction.[42] Regardless, the fact that Ditar had actual knowledge at the time of sale of the eventual destination of the merchandise sold is confirmed by the fact that the sales official in charge separated out the expense for the new print plate as a distinct line item on the invoice; a practice which, by the company's own admission, is done only for export sales.[43] While Commerce officials confirmed the unique circumstances of the sale, the limited nature of the knowledge, and the reasonability of Ditar's explanation as to why questions regarding the nature of the sale were not identified and brought to Commerce's attention prior to verification, these facts do not speak to the actual evidence regarding Ditar's knowledge and whether the classification of the sale as a home-market sale was appropriate where such evidence of actual knowledge exists.[44]

---

[41] *See* Verification Report at 4-5, 15-16, and Verification Exhibits SVE-1 and SVE- 17.
[42] *Id.*
[43] *Id.*
[44] Commerce maintains that the analysis of "constructive knowledge" relied on in the *Final Determination* should not be disregarded, as it remains highly relevant to resolve the issue as to whether misclassification supports the petitioner's arguments regarding the appropriateness of application of partial or total AFA resulting from unreliable and inaccurate reporting. The Court noted that it was premature to address the question of whether Commerce should have applied total or partial facts otherwise available, and in so doing used an adverse inference, instead remanding for the purpose of first establishing whether Commerce improperly ignored the actual evidence regarding Ditar's knowledge in concluding the evidence regarding constructive knowledge established the sale as properly classified. *See Remand Opinion* at 12 (fn. 6). That question is now resolved and the sale reclassified upon reconsideration. Because Commerce accepted this as a minor correction identified at the outset of verification by the respondent, not a discrepancy identified during verification, the reconsideration resolves only the narrow question of whether a correction was or was not necessary in consideration of the minor issue identified. As a result, a change which merely confirms that the initial reporting was misclassified and corrects for this, does not have any

Thus, upon reconsideration of our application of the knowledge test, Commerce finds Ditar had actual knowledge that the sale in question was destined for the United States. As the record demonstrates, Ditar's own statements acknowledge that at least some of the company's officials critically involved in the transaction in question had knowledge that the merchandise was destined for the United States. These statements are sufficient to establish that Ditar had actual knowledge of the merchandise's destination at the time of sale. Commerce's finding, in this regard, is consistent with the Court's holding that a respondent's admission that it knew of the U.S. destination is enough, by itself, to establish actual knowledge.[45]

Because the record reflects that the respondent maintained actual knowledge of its customer's intent to resell the merchandise in the United States at the time of sale, the sale was misclassified as a home market sale and should have been reported as a U.S. sale. As a result, we have reclassified this sale as a U.S. sale and recalculated the *Final Determination* margin for Ditar. As a result, we have also recalculated the all-others rate, which is derived solely from Ditar's calculated margin.[46]

## IV.   INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on February 17, 2026, in which it provided interested parties the opportunity to submit comment for consideration in these final

---

inherent impact on Commerce's decision in the *Final Determination* that the issue of proper classification of this transaction in consideration of the knowledge test, whether home market sale or U.S. sale, does not support the petitioner's arguments regarding the applicability of partial or total AFA (notably, the petitioner's proposed remedy if Commerce were to agree that partial AFA were appropriate is to merely remove the transactions from the HM dataset, thus, though Commerce does not change its finding that the reporting of this sale in the HM database reflects a discrepancy which warrants application of an adverse inference, the partial AFA result is nevertheless achieved). Regardless, the Court withheld ruling on this issue; thus, our redetermination does not further discuss the issues pending judgment in front of the Court and addresses only the scope of the remand directive.

[45] *See Remand Opinion* at 10.
[46] *See* Draft Results Analysis Memo.

results of redetermination.[47] The petitioner submitted timely comments on the Draft Redetermination on February 27, 2026.[48] The petitioner's comments do not identify any issue with the analysis or methodology employed by Commerce in addressing the sole issue remanded by the Court. However, the petitioner argues that, in recalculating Ditar's margin, Commerce should employ its updated differential pricing analysis. Commerce addresses the petitioner's comment below, but makes no change to differential pricing methodology used in the *Final Determination*, consistent with our practice to limit changes on remand to those resulting from issues remanded by the Court and/or challenged by parties in litigation.

No interested party submitted comments regarding Commerce's analysis reconsidering the sole substantive issue remanded by the Court or the methodology used to recalculate Ditar's margin upon reconsideration and reclassification of the transactions at issue. As no party provided substantive comment regarding the Draft Redetermination, there are no issues to address regarding Commerce's response to the *Remand Opinion and Order*, as discussed in the "Analysis" section above.

**Issue:**      **Whether to Modify the Differential Pricing Analysis**

The following reflects the verbatim executive summary of arguments submitted by the petitioner. *See* Petitioner's Comments at 1-2. For further details, *see* Petitioner's Comments at 2-3.

> In the Draft Redetermination, Commerce applied its now-obsolete differential pricing analysis based on the Cohen's *d* test and the three-outcome ratio test. For the final redetermination, Commerce should employ its updated differential pricing analysis, including the new two percent "price difference test" and binary "ratio test," which in July 2025 replaced the older methodology rejected by the Federal Circuit. The original May 2024 final determination in this case predated the change in methodology. Nevertheless, Commerce has applied the new differential pricing

---

[47] *See* Draft Results of Redetermination Pursuant to Court Remand, *Coalition for Fair Trade in Shopping Bags v. United States*, Court No. 24-00157, Slip Op. 25-129 (CIT October 1, 2025), issued February 17, 2026 (Draft Redetermination). The "Analysis" section above is unchanged from the Draft Redetermination.
[48] *See* Petitioner's Letter, "Comments Regarding Draft Results of Redetermination," dated February 27, 2026 (Petitioner's Comments).

12

analysis in other recent redeterminations of pre-2025 cases, even without explicit instructions to do so from the Court. Earlier this month, Commerce recalculated a dumping margin for a respondent from the 2024 final determination in *Steel Racks from China* using the new methodology, notwithstanding that there were no explicit instructions in the court's remand instructions to address differential pricing. Here, as in the *Steel Racks* redetermination, Commerce should apply its current differential pricing methodology and, as a consequence, Ditar's dumping margin should be calculated using the average-to-transaction comparison method.

**Commerce's Position:**

Commerce disagrees that it is appropriate to revise the margin calculation for Ditar to utilize the revised differential pricing methodology. This change was not identified in the petitioner's complaint in this litigation, and the Court has not otherwise remanded the issue. Therefore, it is outside the scope of the *Remand Order*.

It is well-settled that Commerce may only address issues specified in a remand order.[49] Further, Commerce may not adopt a change in methodology that was neither requested by the parties nor authorized by the Court."[50] Thus, in redeterminations pursuant to Court remand, Commerce normally limits changes to the margin calculations only to those which are directly responsive to the Court's directive, and does not consider issues that have not been previously challenged by parties or otherwise remanded.[51] The *Remand Opinion and Order* make no mention of the differential pricing methodology, let alone instruct Commerce to perform a different differential pricing analysis. Nor do the petitioner's comments on this issue claim that *Marmen* and *Stupp* constitute intervening judicial authority that warrants revising the methodology.

---

[49] *See Hussey Copper, Ltd. v. United States*, 960 F.Supp.315, 318 (CIT 1997).
[50] *See Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806, 806-07 (CIT 1998).
[51] *See Final Results of Redetermination Pursuant to Court Remand, Jinan Yipin Corporation, Ltd. and Shandong Heze International Trade and Developing Company v. United States*, Consol Court No. 04-00240, Slip Op. 09-70 (CIT July 2, 2009), dated February 25, 2010, at 48, available at https://access.trade.gov/resources/remands/09-70.pdf.

Rather, the sole basis the petitioner identifies in support of this request for revision is a recent draft redetermination which purports to establish that Commerce's practice is to apply the revised differential pricing analysis in other recent redeterminations of pre-2025 cases even without explicit instructions to do so from the Court.[52] However, the facts of the steel racks case are inapposite. In that case, the Court directed calculation of an individual margin for a firm for which it found Commerce's application of an adverse inference in the underlying investigation to be impermissible.[53] Thus, the steel racks draft redetermination involves the initial calculation of a margin for a firm for which no margin was calculated previously. Utilizing the most up-to-date programming language and methodologies, including the revised differential pricing analysis, reflects a practical necessity for current calculation of an initial rate regardless of the underlying period; it does not reflect an intentional decision to revise the differential pricing calculation for margins previously calculated in that segment of the proceeding absent any argument, comment, complaint, or directive in that case.[54]

Accordingly, the petitioner identifies insufficient basis to compel Commerce to depart from its standard practice to implement changes which are directly responsive to the remand directive, and we have made no changes to the differential pricing methodology from that used in the *Final Determination* calculation.

## V.    FINAL RESULTS OF REDETERMINATION

For the reasons explained above, in line with the Court's instruction, Commerce has re-classified the transactions at issue as U.S. sales and recalculated the margin. As a result of our

---

[52] *See* Petitioner's Comments (citing "Draft Results of Redetermination Pursuant to Court Remand," dated February 10, 2026, pertaining to Certain Steel Racks and Parts Thereof from China, at 9-12 available on ACCESS under Barcode: 4878327-01; *Nanjing Dongsheng Shelf Mfg. Co., Ltd. v. United States*, 781 F. Supp. 3d 1374 (CIT 2025)).
[53] *Id.*
[54] Indeed, the steel racks draft redetermination specifically does not recalculate the dumping margins for the two mandatory respondents individually reviewed in the investigation or separate rate based off the weighted average of the two, calculated using the former differential pricing methodology.

calculations, Ditar's dumping margin changes from 11.06 to 11.16 percent, and, consequently, the all-others rate changes from 11.06 to 11.16 percent. Because the estimated weighted-average dumping margin for Ditar and for all other producers and exporters differs from those in the *Final Determination*, we intend to issue a *Timken*[55] notice with an amended final determination should the Court sustain these final results of redetermination.

| Producer or Exporter | Weighted-Average Dumping Margin (percent) |
|---|---|
| Ditar S.A. | 11.16 |
| All Others | 11.16 |

3/13/2026

X _/s/ Chris Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[55] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).